# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | Case No: 21-cr-291-1 |
| | 18 U.S.C. § 111(a)(1) |
| | 18 U.S.C. § 661 |
| v. | |
| **THOMAS F. SIBICK,** | **FILED** |
| Defendant. | MAR - 3 2023 |
| | Clerk, U S District & Bankruptcy Courts for the District of Columbia |

## STATEMENT OF OFFENSE

Pursuant to Federal Rule of Criminal Procedure 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, Thomas F. Sibick, with the concurrence of his attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

### *The Attack at the U.S. Capitol on January 6, 2021*

1. The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

2. On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

3. On January 6, 2021, a joint session of the United States Congress convened at the

TFS
02/21/23

United States Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4. As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

5. At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades, and officers of the U.S. Capitol Police, and the crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.

6. At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however,

TFS
02/21/23

shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the U.S. Capitol, requiring the expenditure of more than $1.4 million dollars for repairs.

7.  Shortly thereafter, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day. In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### *Thomas F. Sibick's Participation in the January 6, 2021, Capitol Riot*

8.  On January 6, 2021, the U.S. Capitol Police ("USCP") requested assistance from the Metropolitan Police Department ("MPD") and other law enforcement agencies in the area to protect the Capitol, impede more people from entering the Capitol, and expel the crowd that was already inside the Capitol. Multiple MPD officers and other law enforcement officers came to assist, including MPD Officer Michael Fanone. The officer was wearing a full MPD uniform, to include a marked helmet and tactical vest, with his police badge, duty belt, and official insignia clearly displayed.

9.  At approximately 3:00 p.m., a group of USCP and MPD officers had formed a

TFS
02/21/23

police line at one of the two glass doorways on the lower west terrace that leads inside the U.S. Capitol building to prevent the mob from entering the building through that entrance. At around 3:08 p.m., the defendant joined the rioters in the lower west terrace archway who were pushing against the police line. The defendant advanced into the tunnel to the front of the mob near the police line. At 3:11 p.m., the defendant turned around and moved outside the tunnel. After he was outside the tunnel, he said to another man in the crowd who thanked him for his service, "Let's go. Let me just get refreshed."

10. The defendant took a video of himself in the mob near the inauguration ceremony stage of the lower west terrace screaming into his camera, "Just got tear-gassed, but we're going, baby, we're going! We're pushing forward now!" The video, which the defendant posted to Instagram, pans the crowd with the caption, "Wildest experience of my life!!"

11. At approximately 3:15 p.m., Officer Fanone came to the front of the police line. As officers began to push the rioters back from the doors around 3:18 p.m., another individual pulled Officer Fanone through the tunnel and into the crowd of rioters outside. Once Officer Fanone was in the mob, various members of the crowd physically assaulted Officer Fanone. During the course of the attack, Officer Fanone was tased, kicked, punched, pushed, grabbed, and hit with objects by the crowd, as well as having his limbs restrained while a rioter tried to remove the officer's service weapon forcibly from its fixed holster. A member of the mob threatened to take Officer Fanone's gun and kill him.

12. While the mob was attacking Officer Fanone, the officer's body-worn camera shows the defendant reaching toward the officer at 3:19 p.m. and forcibly removing the officer's badge and radio, both of which were securely fixed to the officer's tactical vest.

13. When the defendant made physical contact with the officer in order to forcibly remove Officer Fanone's badge and police radio, the defendant knew that the officer was engaged



TFS
02/21/23

in the performance of official duties as an officer from the Metropolitan Police Department who was assisting the United States Capitol Police.

14. At 3:20 p.m., Officer Fanone's body-worn camera shows individuals in the crowd surrounding Officer Fanone to protect him from his attackers and then escorting him back to the police line.

15. At 3:36 p.m., the defendant posed for a picture of himself holding and pointing to a USCP riot shield.

16. On January 7, 2021, the defendant posted an Instagram video in which he stated that he was "very worried for America. Our system is broken. Our parties are divided. The people need to heal. What happened yesterday was a disgrace; an innocent life was lost. But the people are mad and the people have spoken. The violence is no different than the protests that we saw all summer long. . . ."

17. The FBI conducted an initial interview with the defendant on January 27, 2021. At the time, agents did not know that the defendant had participated in the attack on Officer Fanone. The defendant told the agents that he saw members of the mob attack an officer and try to get his gun. The defendant claimed that he tried to reach the officer and pull him away but was unable to do so, and that he decided to leave, fearing for his own life and the officer's.

18. On February 2, the defendant called an agent to tell him he planned to e-mail more information about the assault of the police officer that he witnessed. When asked about his previous account, the defendant said that he did not have anything different to add, that his previous account was accurate, and again falsely claimed that he had not participated in the assault on the officer in any way.

19. On February 23, 2021, the FBI reinterviewed the defendant after agents watched

TFS
02/21/23

Officer Fanone's body-worn camera video and saw clear evidence that the defendant had stolen the officer's badge and radio. Although the defendant initially failed to mention his possession of these items, after being shown screenshots, the defendant admitted that he grabbed the officer's badge and radio, but claimed that he had reached in to try to help the officer. The defendant also stated that he pressed the radio's emergency button to summon help. MPD's records of the use of the emergency button show that it was pressed at 3:37 p.m. – approximately 16 minutes after others had already escorted Officer Fanone back to the safety of the police line.

20. During the interview, when asked what he did with the badge and radio, the defendant changed his story three times. After first stating that he dropped the badge and radio immediately and left, he then told agents that he carried the items away but dropped them in the trash on Constitution Avenue. Next, explaining he needed to "recant" that statement, the defendant admitted he brought the badge and radio home to Buffalo, then claimed that he had intended to turn the items over to the FBI but instead threw them in a dumpster.

21. On February 24, 2021, the defendant told agents that the dumpster was behind the Lenox Hotel in Buffalo. Two days later, however, after an agent told the defendant that the FBI planned to check the hotel's video surveillance, the defendant admitted that he had buried the badge in his backyard. The defendant stated that he purchased a metal detector to locate the badge and then gave the agent a bag containing Officer Fanone's badge covered in mud.

22. The radio, which cost $5,500.79, was never recovered.

23. As a result of the attack, Officer Fanone sustained significant and painful injuries. As Daniel Rodriguez repeatedly applied a taser to the back of Officer Fanone's neck, Officer Fanone experienced excruciating pain and was rendered momentarily helpless. He can be heard screaming on his body-worn camera. The tasing caused burn marks to the back of Officer Fanone's neck that resulted in scarring. Shortly after being tased, Officer Fanone's body-worn camera shows

TFS
02/21/23

the efforts of those around him trying to elicit a response from him, indicating that he lost consciousness for more than two minutes.

    24.    Officer Fanone was then transported to the Emergency Room, where ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

    25.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

    26.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[1] https://medlineplus.gov/lab-tests/troponin-test/
[2] https://medlineplus.gov/lab-tests/creatine-kinase/

TF 5
02/21/23



27.     The defendant does not have first-hand knowledge of the actions of Kyle Young, Albuquerque Head, or Daniel Rodriguez in Washington, DC on January 6, 2021, and therefore could not truthfully testify about their activities on that day.

Respectfully submitted,

MATTHEW M. GRAVES
Acting United States Attorney
D.C. Bar No. 481052

By:     /s/
KIMBERLY PASCHALL
CARA GARDNER
Assistant United States Attorney

TFS
02/21/23

## DEFENDANT'S ACKNOWLEDGMENT

I, Thomas Sibick, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 02/21/2023

Thomas F. Sibick
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 3/3/2023

Stephen F. Brennwald
Attorney for Defendant

TFS
02/21/2023